UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM BRATCHER,  )  | | |
| Plaintiff,  )  | | |
|   )  | | |
| vs.  )  | 1:04-CV-2054-SEB-VSS | |
|   )  | | |
| SUBARU OF INDIANA AUTOMOTIVE,  )  | | |
| INC.,  )  | | |
| Defendant.  )  | | |

## ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant's Motion for Summary Judgment on Plaintiff's claims pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"). William Bratcher ("Bratcher") brought this action alleging that Subaru of Indiana Automotive, Inc. ("Subaru") terminated his employment in retaliation for Bratcher's exercise of his FMLA rights (Count I) and that Subaru interfered with, restrained, and/or denied Bratcher's exercise or attempt to exercise his FMLA rights, both in violation of 29 U.S.C. § 2615(a). Subaru contends that Bratcher was never denied any of his rights under the FMLA and that he was terminated for providing false information to Subaru officials on a matter of company record (i.e. Bratcher's activities during a day on which he claimed FMLA leave and had been under surveillance by a private investigator).

As we explain below, we GRANT Defendant's Motion for Summary Judgment on all counts.

Factual Background

Bratcher began working at Subaru as a temporary employee in 1994 and was hired as a full-time production associate on March 16, 1996. Bratcher Dep., p 37, 46-47. In the course of his employment at Subaru, Bratcher always worked on the production line in the "trim and final" line for passenger cars. Bratcher Dep., p 36.

*Employee Handbook*

On March 16, 1996, when he became a full-time employee at Subaru, Bratcher received a copy of the Fourth Edition of the Associate Handbook and read through it when he received it. Bratcher Dep., p 45-46. On March 12, 2003, Bratcher received a copy of the Eighth Edition of the Associate Handbook and on March 19, 2004, Bratcher received a copy of the Ninth Edition of the Associate Handbook. Dep. Bratcher p 52-54. The Associate Handbook expressly informed Bratcher, in the section entitled, "Serious Misconduct," that "intentionally misrepresenting or falsifying any information concerning employment or any report or [Subaru] record" could result in his immediate termination. Excerpt from Associate Handbook, Exhibit C.[1]

*Bratcher's History of FMLA Use and Problems with Subaru.*

During the entire time he worked at Subaru, Bratcher suffered from migraine headaches and was treated by a physician for this condition. Bratcher Dep., p 31-32. As

---

[1] Defendants' exhibit does not specify from which edition of the Associate Handbook the provided excerpt is lifted nor do Defendants specify whether the referenced section of the Associate Handbook underwent changes between any of the relevant editions.

2

a result of his condition, Bratcher requested and was approved for multiple FMLA leaves during his years of employment. Tolliver Aff., ¶5.

Bratcher reports that Subaru had previously fired him in September or November of 2003 for allegedly failing to call into work to request FMLA leave. When Bratcher explained that he had called from his cell phone and offered to bring in phone records to support this, Subaru rehired him and paid him for the day off. Bratcher Dep., p 83-86; Bratcher Aff., ¶12.[2] Bratcher also notes that in the Fall of 2003 Subaru committed several accounting errors which overbilled his actual use of FMLA hours. For example, Bratcher was billed eight hours for leave when he only took two hours, was charged for FMLA leave when he had not requested it, and was billed for FMLA leave on days he was actually at the plant. When Bratcher pointed out these errors to Subaru officials, the mistakes were always corrected. Bratcher Dep., p 61-62.

*Subaru's Purported Reason to Investigate Bratcher's Use of FMLA Leave.*

In September of 2004, Subaru decided to conduct an investigation into the validity of Bratcher's FMLA leave. Tolliver Aff., ¶6; Subaru Investigation Summary, Exhibit F. Subaru maintains that it was only after the pattern, frequency and nature of Bratcher's FMLA use had reached the point suggesting the possibility of abuse that it decided to conduct an investigation into the validity of his FMLA leaves. Subaru states that in the

---

[2] From Bratcher's testimony, it appears that Subaru was under the impression he had called from the clinic using the clinic's phone and not his cell phone. A more detailed recounting of this mix-up is not relevant to our determination today.

twelve months prior to his termination, Bratcher had requested, and had been granted, a total of thirty-seven FMLA leaves of absence, totaling forty-six days.  Subaru contends that Bratcher's use of FMLA leave exhibited a distinct pattern whereby many of his FMLA absences immediately preceded, or followed, a weekend.  Tolliver Aff., ¶5.  For example, Subarua notes that Bratcher's 2004 Daily Attendance Record showed he had eleven unpaid absences on Mondays which were not holidays and an additional eleven unpaid absences on Fridays which were not holidays.  Subaru also reports that Bratcher missed eight consecutive Fridays due to FMLA leave immediately before he was terminated.  Exhibit E.  Bratcher notes that Subaru approved every single FMLA leave he requested, including the eight consecutive Fridays.  Exhibit E; Exhibit #2.

In addition to reviewing Bratcher's record of past FMLA utilization, Subaru contacted a physician, who reported that the nature of Bratcher's illness (migraine headaches) was not limited to specific day(s) of the week, nor would it be predictable or normally last for several days.  Exhibit F.

Finally, Subaru contends that several of Bratcher's co-workers had voiced concerns essentially alleging that Bratcher's FMLA leaves were fraudulent.  Exhibit F.  Bratcher disputes that such individuals or complaints actually exist.[3]

---

[3] There is considerable dispute between the parties about the alleged remarks of the unnamed coworkers.  Plaintiff suggests such complaints are fictitious since Subaru has refused to produce the name and address of any of the alleged complainants.  See, e.g., Exhibit #4, Def. Interrogatory Responses, pg. 5 (stating Subaru "is not aware of the names, addresses or telephone numbers of any of the individuals who anonymously reported the Plaintiff's alleged fraudulent use of FMLA leave to [Subaru] management before his employment was

(continued...)

*Subaru's Investigation of Bratcher's Use of FMLA Leave.*

In late August or early September of 2004, Subaru contacted Phenix Investigations, Inc. ("Phenix") to conduct surveillance on Bratcher. Tolliver Aff., ¶7; Bowman Aff., ¶ 3. Phenix conducted surveillance on Bratcher on Thursday September 2, 2004, Wednesday September 8, 2004, and Friday September 10, 2004. Report of Phenix Investigations, Inc., Exhibit G.

The surveillance that led to Bratcher's termination occurred on Friday, September 10, 2004. On Thursday, September 9, 2004, the night before, Bratcher telephoned Subaru to indicate he would not be in to work the next day due to a migraine headache, so Subaru decided to send a Phenix investigator to Bratcher's home the next day, Friday, to investigate his absence. Tolliver Aff., ¶8. On Friday, the investigator observed Bratcher leave his home at 1:53 p.m, drive to a nearby convenience store, and depart the convenience store shortly thereafter. The investigator lost Bratcher in traffic and subsequently returned to his observation post across the street from Bratcher's home. At 2:44 p.m., when Bratcher had not yet returned home, the investigator discontinued the surveillance. Report of Phenix Investigations, Exhibit G.

*Bratcher's Meeting with Subaru Officials on September 15, 2004.*

Bratcher reports that he felt better on Saturday, September 11th and that he also

---

³(...continued)
terminated"). Since the remarks of unnamed coworkers are not relevant to our analysis of Bratcher's claim, we decline to wade into this dispute.

5

felt good on Sunday, September 12th, until that evening. On Monday, September 13, Bratcher called in sick and took another FMLA leave day. The next day, Tuesday, September 14, 2004, Bratcher went to work and worked his full schedule. Bratcher Dep., p 115-17.

On Wednesday, September 15, 2004, Bratcher again went to work and Subaru officials held a meeting with him to discuss his attendance history and FMLA use (the "September 15th meeting"). Bratcher Dep., p 118-19; Tolliver Aff., ¶9. Present at the meeting were Kent Tolliver ("Tolliver"),[4] Manager, Associate Relations; Myron Henderson ("Henderson"), Group Leader, Associate Relations; and Rick Johnson, Employment Group Specialist. Tolliver Aff., ¶9; Subaru Summary of Investigation, Exhibit F.[5] Bratcher contends that he understood the meeting to be an informal meeting about FMLA abuse by other Subaru employees. Bratcher Aff., ¶ 8.[6]

In the September 15th meeting, Tolliver asked about Bratcher's reasons for his absences and about his medical condition. Bratcher answered that he suffered from migraine headaches and that his condition had gotten worse as he had grown older.

---

[4] Tolliver has been employed as Manager, Associate Relations, which is part of the Human Resources Department at Subaru, since January 12, 2004. Tolliver's duties include supervision of employee relations, hourly employment, and the community and media relations function at Subaru. Tolliver Aff., ¶2.

[5] There is a dispute as to whether or not Bratcher was aware that Subaru was investigating his FMLA leave utilization. This dispute, however, is not relevant to our determination so we decline to address it further than this footnote.

[6] Bratcher also contends that he was never told by Subaru that his job might be on the line as a result of the September 15, 2004, meeting.

Bratcher also said his condition was often aggravated by stress and that his headaches often caused him to be incapacitated. Tolliver asked Bratcher if he was aware that if his headache improved, he was obligated to come into work on any given day to work the remainder of his shift. Bratcher replied that he was aware of this obligation, but that often his condition would last "a couple days" at a time. Tolliver Aff., ¶10; Subaru Summary of Investigation, Exhibit F.

Henderson and Tolliver also asked Bratcher to describe in detail his most recent absences on Friday, September 10, 2004, and Monday, September 13, 2004. Tolliver Aff., ¶11; Subaru Summary of Investigation, Exhibit F. Bratcher responded that he began to feel ill on Thursday evening (September 9), and, knowing the pattern of his headaches, he knew he would be too ill to report to work the next day. When asked if this condition continued through the following Monday (September 13), Bratcher replied, "no," that he, in fact, began to feel better on Saturday, September 11, but had suffered another migraine headache on Sunday evening and became too ill to report to work on Monday. When asked if he was incapacitated due to a migraine on Friday (September 10), Bratcher replied that he was and remained so until early the following afternoon (Saturday). In describing his actions on Monday, September 13, Bratcher stated that when he woke up he knew he was not going to be able to go to work, so he called in sick, took some medicine, went back to bed and did not get up until 6:00 in the evening. Bratcher Dep., p 116. When Henderson asked Bratcher what he had done the preceding Friday (September 10), Bratcher replied that to the best of his knowledge it was pretty similar to Monday.

Henderson asked, "Well you stayed in bed all day?" Bratcher answered, "Yeah, I'm sure I probably did." Bratcher Dep., p 127-28.[7] Bratcher was asked at least twice during the September 15th meeting whether he stayed in bed all day on Friday, September 10, and he contends he responded in this same manner both times. Bratcher Dep., p 131; see also Tolliver Aff., ¶12; Subaru Summary of Investigation, Exhibit F.[8]

*Subaru's Decision to Terminate Bratcher.*

As a result of the meeting on September 15, 2004, Tolliver determined that Bratcher had falsified a matter of company record. Specifically, in the September 15 meeting, Bratcher reported on at least two or three occasions that on Friday, September 10, 2004, he had suffered a migraine headache that was so debilitating that he was unable to get out of bed until the following afternoon. Tolliver believed this information was false based on the information provided by Phenix that its investigator witnessed Bratcher leaving his home and remaining away for at least 51 minutes. Tolliver Aff., ¶13; Subaru Summary of Investigation, Exhibit F.

On Thursday, September 16, 2004, Tolliver terminated Bratcher's employment, giving him a termination letter toward the end of the work day. Bratcher Dep., p 144;

---

[7] In his affidavit, Bratcher asserts: "I never told Subaru that I knew with any degree of certainty my whereabouts on September 10, 2004." (Bratcher Aff., ¶ 9). We are unclear if he intends this statement to be in conflict or concert with his deposition testimony.

[8] Subaru contends that when he was asked to elaborate on his actions on Friday, Bratcher responded that he remained home in bed all day Friday and did not get out of bed until Saturday afternoon, adding that he "just got up long enough to get something to eat." Tolliver Aff., ¶11; Subaru Summary of Investigation, Exhibit F.

Termination Letter, Exhibit B.  The termination letter states: "Upon investigation, it has been determined that you recently falsified information regarding a matter of company record.  As stated in the [Subaru] Associate Handbook, your actions are considered 'Serious Misconduct.'  As a result of your conduct, Subaru has decided to terminate your employment, effective immediately."  Termination Letter, Exhibit B.

*Post Termination Information*

Following his termination, Bratcher requested a peer review meeting.  Dep. Bratcher p 150-51.  Any associate whose employment is terminated (except for reasons apparently not relevant in this case) is entitled to appeal to a Peer Review Panel.  The Peer  Review Panel consists of five associates and the Manager or Group Leader of the Associate Relations Section, who chairs the Panel, but is a non-voting member.  The Panel conducts a hearing on each appeal request, questions witnesses, reviews pertinent records and makes its decision immediately upon conclusion of the hearing.  Tolliver Aff., ¶ 16.

Bratcher attended the peer review meeting and had a full opportunity to tell his side of the story.  Tolliver presented Subaru's position.  Bratcher Dep., p 159.  David Bowman, from Phenix, also attended the Peer Review Hearing and explained his observations of Bratcher on Friday, September 10, 2004, as had been described in the report Phenix submitted to Subaru.  Bowman Aff., ¶8.

The peer review panel upheld the company's decision to terminate Bratcher's

9

employment. Bratcher Dep., p 162.[9]

## Summary Judgment Standard

On a motion for summary judgment, the burden rests on the moving party, Subaru in this case, to demonstrate "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the nonmovant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. Id. at 322-23. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994), citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Celotex, 477 U.S. at 322-24; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52. (1986).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge, 24 F.3d at 290. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the

---

[9] In connection with his response Brief, Bratcher attempts to introduce evidence by means of an affidavit. However, large portions of Bratcher's affidavit are not admissible and, therefore, have not been considered by the court in our determination. These include all or portions of the following paragraphs: 3-5, 7, 11-18. In addition, portions of Bratcher's affidavit appear to be in conflict with his prior deposition testimony, including paragraphs 9, 11-12. Finally, portions of Bratcher's affidavit are not relevant to Bratcher's claims or our analysis, including paragraphs 16 and 18.

10

nonmovant. Venters v. City of Delphi, 123 F.3d 956, 962 (7th Cir. 1997). If genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920. A plaintiff's self-serving statements, unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

We note that the Seventh Circuit has determined that the summary judgment standard is to be applied with special scrutiny to employment discrimination cases because intent and credibility are such critical issues. See, Senner v. Northcentral Technical College, 113 F.3d 750, 757 (7th Cir.1997); Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir.2000). To that end, we carefully review affidavits and depositions for circumstantial proof which, if believed, would show discrimination. However, it is equally clear that employment discrimination cases are not governed by a separate set of rules and remain amenable to disposition by summary judgment so long as there is no *genuine* dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

Legal Analysis

Bratcher alleges that Subaru terminated his employment because of his use of FMLA leave and also interfered with, restrained, and/or denied his use of FMLA leave. The FMLA contains an anti-discrimination component similar to Title VII, which provides:

> (1) Exercise of rights
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA].
> (2) Discrimination
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA].

29 U.S.C. § 2615(a).

Bratcher claims that Subaru violated § 2615(a) by: (1) terminating his employment for exercising his rights under the FMLA (Count I); and (2) conducting surveillance of Bratcher at his home, which, he alleges, interfered with, restrained, and/or denied his exercise of or his attempt to exercise his FMLA rights (Count II). We address each Count in turn.

*Count I: Termination of Employment in Retaliation for Bratcher's FMLA Use.*

A claim of retaliation under the FMLA is evaluated in the same manner as a claim of retaliation is evaluated under Title VII. Buie v. Quad/Graphics, Inc., 366 F.3d 496, 503 (7th Cir. 2004). Thus, a plaintiff may prove FMLA employment discrimination under by using either the (A) "direct method" or (B) "indirect method." Id.

.    A.    *Direct Method*.

12

Under the direct method of proof, Batcher must show, by way of direct or circumstantial evidence, that Subaru's decision to take an adverse job action against him was motivated by an impermissible purpose, in this case, Bratcher's use of FMLA leave. Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004). The Seventh Circuit has established:

> The plaintiff in a retaliation case should have two (and only two) distinct routes to obtaining/preventing summary judgment. One, the more straightforward . . . is to present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains. If the evidence is uncontradicted, the plaintiff is entitled to summary judgment. If it is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation.

Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002). Direct evidence must "not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999) (internal citations omitted). Also see, Vakharia v. Swedish Covenant Hospital, 190 F.3d 799, 806 (7th Cir. 1999).

Bratcher has not presented any admissible, direct evidence of discriminatory intent on the part of Subaru. Bratcher has only presented his own self-serving statements,

13

unsupported by specific concrete facts reflected in the record,[10] which, as we noted above, cannot preclude summary judgment. See Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993). Accordingly, we determine that Bratcher cannot proceed under the direct method of proof.

    *B.    Indirect Method.*

Under the indirect method of proof, in an adaptation of McDonnell Douglas test to the retaliation context, the Seventh Circuit has held:

> the plaintiff [is required] to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

Stone, 281 F.3d at 644. In sum, the indirect method has three essential steps: (1) Bratcher must first establish a prima facie case of discrimination. (2) If he does, he raises a presumption of discrimination which Subaru must rebut by producing evidence of a legitimate nondiscriminatory explanation of its adverse employment action. (3) If Subaru meets that burden, Bratcher must show, through admissible evidence, that Subaru's explanation is pretextual. See Freeman v. Madison Metropolitan School Dist., 231 F.3d

---

[10] See, e.g., Bratcher Aff., ¶ 15 (stating: "The reason for Subaru terminating my employment is pretextual and dishonest because it terminated me because I was eligible for and took intermittent FMLA leave.")

14

374, (7th Cir.2000); Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000).  We conclude that Bratcher cannot satisfy his burden in either the first or third step.

1. *Lack of a Prima Facie Case*.

To establish a prima facie case of employment discrimination, Bratcher must present evidence showing that: (1) he engaged in a protected activity (taking FMLA leave); (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) at least one similarly-situated employee, not in his protected class, was treated more favorably.  See Gordon v. United Airlines, Inc., 246 F.3d 878, 885-886 (7th Cir. 2001) (discussing Title VII prima facie case); Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1398 (7th Cir. 1997) (same).

At the least, Bratcher has failed to present a prima facie case because he has not identified any similarly-situated employees.  In his affidavit, he attempts to identify such employees and the closest he comes is as follows: "Bob Burthay is an employee with Subaru who was similarly situated to me, in the same position as me, same group leaders, and was accused by Subaru of falsifying a matter of company record, but was never terminated."  Bratcher Aff., ¶ 17.  Bratcher never explains how he knows any of the information he provides about Burthay and, in addition, his recollection of Burthay's employment history is contradicted by Subaru's records, which contain no indication that Burthay was ever accused of falsifying a matter of company record.  Moreover, Subaru has introduced evidence that Burthay has taken FMLA leave every year since 1999; therefore, Burthay was also in Bratcher's "protected class" and thus is not a valid

15

comparison.  Supp. Tolliver Aff., ¶¶ 6-7.  Bratcher does not name any other employees whom he alleges were ever accused of falsifying a matter of company record and were not terminated.  Accordingly, Bratcher has not presented a prima facie case of discrimination.

    2.    *Inability to Prove Pretext.*

Assuming *arguendo* that Bratcher presented a prima facie case, he would still not prevail.  Subaru contends that it fired Bratcher because he " falsified information regarding a matter of company record."  In particular, Subaru contends he lied about whether he was home in bed all during on Friday, September 10, 2004, when he was on FMLA leave.

Because Subaru has presented a legitimate, non-discriminatory reason for Bratcher's termination, the burden shifts to Bratcher to show that this reason is merely pretextual.  The opportunity to argue pretext does not allow the plaintiff simply to second-guess the employer's decision.  We do not sit as a "super personnel department" that reexamines an entity's business decisions.  See Bahl v. Royal Indem. Co., 115 F.3d 1283, 1292 (7th Cir. 1997); Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir.1988).  The question we must answer at the pretext stage of analysis is not "whether the employer's reasons for a decision are 'right but whether the employer's description of its reasons is *honest*.'"  Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997) (emphasis in original) (quoting Gustovich v. AT & T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992)); see also Bahl, 115 F.3d at 1291 (stating "when we

16

consider whether an employer's justification for dismissing its employee is pretextual, the inquiry is not whether the reason for the firing was a correct business judgment but whether the decision makers honestly acted on that reason"). Therefore, plaintiff's "rebuttal must include facts tending to show that the employer's reasons for some negative job action are false, thereby implying (if not actually showing) that the real reason is illegal discrimination." Kariotis, 131 F.3d at 677.

Bratcher has not presented any admissible evidence that Subaru's stated reason for his termination is pretextual. Bratcher's attempts to prove pretext essentially follow one of two tracts: (1) he did not really say what he has said he said to Subaru officials (it confuses us, too) and (2) Subaru has been lying in wait for him and wanted to find a reason to terminate him because he takes too much FMLA leave. On his first contention, Bratcher asserts he did not actually say he spent all of Friday September 10, 2004, in bed because:

> "Yeah, I'm pretty sure I probably did" does not convey certainty of belief. In reality, the plaintiff got out of bed for an hour to get a prescription for his migraines and something to eat. Plaintiff argues that it is patently unreasonable to permit the defendant to boast such an unfounded belief as this.

Pl.'s Resp. Brief at 11-12 (internal citations omitted). We disagree. Subaru had reasonable grounds for suspecting Bratcher was fraudulently taking FMLA leave (e.g. the disproportionate usage of FMLA leave immediately preceding or following weekends, including the eight consecutive Fridays of FMLA immediately preceding his termination). Subaru engaged a private investigator to observe Bratcher's activities during one of his

FMLA leave days and the investigator saw Bratcher leave his home and go to a convenience store. When questioned by Subaru officials five days later, Bratcher said, at least twice, that he was pretty sure he spent all day in bed. Based on these facts, it was entirely reasonable for Subaru officials to conclude that Bratcher had lied to company officials. Bratcher's purely semantic effort to convert "pretty sure" into "uncertain" is utterly unconvincing.

As for Bratcher's second contention, he presents evidence of two events a year before his termination in which Subaru made mistakes regarding his use of FMLA leave and which Subaru promptly corrected when Bratcher pointed out the errors it had made. Bratcher has presented no (admissible) evidence that the mistakes committed by Subaru regarding his FMLA use were intentional. Moreover, Bratcher, himself, admits that in these past instances Subaru demonstrated a willingness to correct its mistakes once they were pointed out to Subaru officials. If anything, Subaru's past actions reveal its willingness to rescind adverse employment actions when it is aware that its stated reasons for the action are erroneous.

Accordingly, we conclude that Bratcher has not presented any admissible facts which would suggest that Subaru's stated reason for his termination was pretextual.

*Count II: Interference with FMLA Usage*.

The parties devote scant briefing to Bratcher's second claim, for good reason, since there is no factual basis to support it. In his Response Brief, Bratcher argues:

The FMLA provides that, "It shall be unlawful for any employer to interfere with,

> restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615. In what is referred to as "entitlement claims," the plaintiff need only prove, "that he is entitled to the benefit he claims." Diaz v. Ft. Wayne Foundry Corp., 131 F.3d 711, 713 (7th Cir. 1997). "We shall continue to resolve suits under the FMLA in the same direct way we did in Price v. Ft. Wayne, 117 F.3d 1022 (7th Cir. 1997): by asking whether the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims." Id.

Pl.'s Resp. Brief at 15. Bratcher argues that "if the 'entitlement' language in the FMLA is intended to prevent anything, it should prevent an employer like this one from harassing, videotaping and firing an employee for the sole and exclusive reason that he was eligible for and took intermittent FMLA leave." Id. at 16.

Bratcher's novel interpretation of the FMLA is unavailing for several reasons, including: (1) he has presented no case law suggesting that an employer cannot conduct investigations into suspected FMLA abuse; (2) he has not introduced any evidence that he was ever denied any of the FMLA leave to which he was entitled; (3) he has not introduced any evidence that Subaru ever denied one of his requests for FMLA leave; (4) he has not introduced any evidence that, as a result of Subaru's actions, he failed to utilize any of the FMLA leave to which he was entitled; (5) he has not introduced any evidence that he even knew about Subaru's surveillance of him before he was fired or that the surveillance in anyway influenced his decision to take FMLA leave;[11] and (6) he has not introduced any admissible evidence that Subaru's decision to terminate his employment

---

[11] To the contrary, the evidence indicates that Bratcher took FMLA leave on Monday, September 13, 2004, three days after the surveillance at issue in this case occurred.

was for "for the sole and exclusive reason that he was eligible for and took intermittent FMLA leave."  In sum, Bratcher has not adduced any evidence that Subaru's actions ever negatively impacted his utilization of FMLA leave.  Accordingly, we conclude there is no factual basis to support Claim II of Bratcher's Complaint.

## Conclusion

For the reasons set forth above, we find that Bratcher's claims against Subaru lack evidentiary support under the FMLA.  Accordingly, Defendant's Motion for Summary Judgment is GRANTED.  IT IS SO ORDERED.

Date: 03/10/2006

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copy to:

Wayne O. Adams III
ICE MILLER LLP
wayne.adams@icemiller.com

Erik Joseph May
erikjmayattorney@sbcglobal.net

Steven F. Pockrass
ICE MILLER LLP
pockrass@icemiller.com

Margaret Dewey Wielenberg
ICE MILLER LLP
margaret.wielenberg@icemiller.com